IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 04-cv-00856-JLK-CBS

FIRST DATA CORPORATION,
a Delaware corporation,
        Plaintiff,
v.

ARPAD KONYA, an individual,
ARPAD KONYA, SR., as Legal Representative of Arpad Konya,
JOHN DOE, an individual, and
HYPER-CASH INCORPORATED, a New York corporation,
        Defendants.

---

**RECOMMENDATIONS REGARDING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND MOTION IN LIMINE TO EXCLUDE
TESTIMONY OF DR. ZOLTAN ZIEGLER,
and COUNTERCLAIM PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

---

Magistrate Judge Craig B. Shaffer

THIS MATTER comes before the court on Plaintiff First Data Corporation's ("First

Data" or "Plaintiff") Motion for Summary Judgment (doc. # 72), filed December 29, 2006.

Defendant and Counterclaim Plaintiff Arpad Konya, Sr. (the "Conservator"or "Defendant") filed

an Opposition to Plaintiff's Motion for Summary Judgment on January 22, 2007. First Data filed

a Reply in Support of Its Motion for Summary Judgment on February 6, 2007. Also before the

court is First Data's Motion in Limine to Exclude Testimony of Dr. Zoltan Ziegler (doc. # 75),

filed on December 30, 2006, and the Conservator's Motion for Partial Summary Judgment (doc. #

77), filed on January 2, 2007. Briefing on the latter motions was completed on February 6, 2007

1

with the filing of First Data's Reply in Support of its Motion in Limine.[1]

Pursuant to a Memorandum dated January 3, 2007, the District Court referred the Counterclaim Plaintiff's Motion for Partial Summary Judgment (doc. # 77) to this Magistrate Judge for proposed findings of fact and a recommendation.  In a supplemental Memorandum dated March 90, 2007, the District Court further directed the Magistrate Judge to submit proposed findings of fact and recommendations on Plaintiff's Motion for Summary Judgment (doc. # 72) and Motion in Limine to Exclude Testimony of Dr. Zoltan Ziegler (doc. # 75).  I heard oral arguments on the pending motions during a hearing on April 20, 2007.  The court has reviewed the pending motions, the parties' briefs and attached exhibits, the entire case file, and the applicable law, and is sufficiently advised in the premises.  For the reasons set forth herein, the court recommends that Plaintiff's Motion in Limine to Exclude Testimony of Dr. Ziegler and the Conservator's Motion for Partial Summary Judgment be denied.  The court further recommends that Plaintiff's Motion for Summary Judgment be granted in part and denied in part.

## FACTUAL BACKGROUND

Plaintiff First Data initiated this action on April 26, 2004, seeking a declaratory judgment that a Patent Assignment Agreement executed by First Data and Arpad Konya in November 2000 is valid and enforceable.  The Agreement in question purportedly assigned and transferred to First Data Mr. Konya's rights, title and interest in and to U.S. Patent No. 5,937,396 entitled "System for ATM/ATM Transfers" (the "'396 Patent").  On January 24, 2005, Arpad Konya, Sr., in his capacity as legal representative for Defendant Konya, filed his First Amended Counterclaim,

_____

[1]The Conservator apparently elected not to file a reply brief in support of his Motion for Partial Summary Judgment as the deadline for filing that brief passed on February 6, 2007.

seeking rescission and a declaratory judgment invalidating the Patent Assignment Agreement, a second claim for other equitable relief in the form of an accounting and constructive trust for the profits and other benefits received by First Data "as a result of the use of Konya's patent and other rights," and a third claim for unjust enrichment by First Data.  On June 29, 2006, this court issued a Minute Order setting a November 30, 2006 deadline for completing all discovery, and a dispositive motion deadline of December 31, 2006.  During the course of the litigation, the parties have conducted extensive discovery both in the United States and Hungary.

For purposes of the pending motions, the following facts are undisputed.[2]  First Data Corporation is a financial services company based in Greenwood Village, Colorado.  First Data provides electronic commerce and payment services solutions to millions of merchant locations and more than a thousand credit and debit card issuers.  At all times relevant to this litigation, Defendant Arpad Konya has been a citizen of the Republic of Hungary.  On August 10, 1999, the United States Patent Office issued Arpad Konya the '396 Patent which is described as a system or method for transferring currency electronically using ATM machines, various types of transaction cards and/or general purpose computers.

---

[2]The Conservator does not dispute the facts set forth in paragraphs 1, 3, 4, 5, 6, 8, 9, 12, 14, 20, 21, 30 and 34 of First Data's Brief in Support of its Motion for Summary Judgment. While the Conservator challenges the admissibility of other "undisputed facts" identified by First Data, he has failed to comply with the District Judge's Pretrial Procedures concerning the form and content of summary judgment motions.  To the extent that the non-moving party denies an asserted material fact set forth by the movant, such denials must be made in corresponding numbered paragraphs and "shall be accompanied by a *brief* factual explanation of the reason(s) for the denial and a *specific reference* to evidence in the record supporting the denial."  *See* Pretrial and Trial Procedures of Senior Judge John L. Kane, at pp. 7-8.  Even though a non-moving party may dispute the admissibility of facts on legal grounds, the facts themselves must still be admitted and the party's position should be presented in the portion of its brief devoted to legal argument.

On or about February 28, 2000, Arpad Konya sent a letter to Marcus Cudina with Western Union Financial Services, in Paramus, New Jersey.  *See* First Data's Brief in Support of it Motion for Summary Judgment, at 3; Defendant's Opposition, at 3.  During the relevant period, Western Union Financial Services was a subsidiary of First Data.  Through Western Union, First Data operated a business called "Z-Cash."  Konya's February 28, 2000 letter offered to start negotiations regarding the '396 Patent and provided a copy of the '396 Patent, which Konya suggested "would be useful for Western Union, Inc."  *See* Exhibit A-2 attached to First Data's Brief in Support of it Motion for Summary Judgment.  Konya followed up with a second letter on April 29, 2000, expressing an interest in "possible cooperationship" with Western Union and suggesting a meeting during the first weeks of July 2000.  *See* Exhibit A-5 attached to First Data's Brief in Support of it Motion for Summary Judgment.  On August 22, 2000, Konya sent a facsimile to Edward Fuhrman of Western Union Financial Services regarding the '396 Patent.  In that facsimile, Konya again expressed a desire to open negotiations and enter into a partnership. *See* Exhibit A-6 attached to First Data's Brief in Support of it Motion for Summary Judgment. On September 1, 2000, Cudina received a facsimile from Western Union's Hungarian agent, who indicated that Konya planned to take action against Western Union because Konya believed Western Union was improperly using his intellectual property.  *See* First Data's Response to Conservator's Motion for Partial Summary Judgment, at p. 6.  On September 18, 2000, Konya sent a facsimile to Western Union indicating that he was "ready to make a deal with you" regarding the '396 Patent.  *See* Exhibit A-7 attached to First Data's Brief in Support of it Motion for Summary Judgment.

On September 21, 2000, Cudina set a letter to Konya indicating that all future

correspondence regarding the '396 Patent should be directed to Dallas Martin, an in-house

attorney with First Data.  Konya was told that Mr. Martin was based at First Data's headquarters

in Colorado and was

> responsible for FDC/Western Union intellectual properties.  He is the person best
> suited to assist you in your proposals and requests and can advise senior
> management on any opportunity.

*See* Exhibit A-8 attached to First Data's Brief in Support of it Motion for Summary Judgment.

Konya sent Martin a facsimile on October 12, 2000, in which he expressed a desire to "continue

negotiating next week."  *See* Exhibit A-9 attached to First Data's Brief in Support of it Motion

for Summary Judgment.  Thereafter, the parties agreed to continue their negotiations with a

meeting in  New York City.  Martin contacted Charlton Templeton, First Data's Vice President of

National Sales and the Z-Cash Network, and asked him to participate in the New York meeting

with Konya.  Apparently, Mr. Templeton was First Data's "subject matter expert on ATM

technology and [First Data's] strategy, providing money transfers through that technology."  *See*

First Data's Brief in Support of it Motion for Summary Judgment, at para. 12; Defendant's

Opposition, at p. 3.  During the relevant time period, Templeton was based in Atlanta, Georgia.

On October 24, 2000, Dallas Martin and Charlton Templeton, met with Konya, Samuel Feldman,

and Hersham Saleh.  *See* First Data's Brief in Support of it Motion for Summary Judgment, at

para. 14; Defendant's Opposition, at p. 3.  This was the only face-to-face meeting between Konya

and First Data representatives that occurred prior to consummation of the subject transaction.

On November 13, 2000, Templeton sent Konya by facsimile from Atlanta a draft of an

agreement.  The facsimile cover sheet directed Konya to review the proposed contract and to

contact Templeton with any comments.  The cover sheet also indicated that the agreement must

be notarized by a United States notary public.  In addition, Konya was asked to provide First Data

with bank wiring instructions for the negotiated payment of $200,000.  *See* Exhibit A-13 attached

to First Data's Brief in Support of it Motion for Summary Judgment, at para. 20; Defendant's

Opposition, at p. 3.  The draft agreement sent to Konya contained blanks on the first page, for

insertion of the effective date of the agreement and the address of Konya's company, Hyper-Cash,

Inc.  On November 16, 2000, Konya sent Templeton a facsimile requesting that the agreement be

sent to him in Hungary.  The same facsimile provided an initial set of wiring instructions for

Konya's account at the Budapest Bank.  *See* Exhibit A-14 attached to First Data's Brief in

Support of it Motion for Summary Judgment, at para. 20; Defendant's Opposition, at p. 3.

> While the parties dispute Defendant Konya's mental status at the time, on November 17,

2000, Konya appeared before Consular Associate Linda D. Olesen with the United States

Embassy in Budapest Hungary and executed the Patent Assignment Agreement.  The Agreement

specifically states in Section 4(a) that it "shall be governed by the laws of the State of Colorado,

United States of America."  *See* Exhibit A-16 attached to Plaintiff's Brief in Support of its Motion

for Summary Judgment.  Attached to the executed Patent Assignment Agreement was a

Certificate of Acknowledgment of Execution of an Instrument, in which Ms. Olesen indicated that

Mr. Konya had executed the Agreement after being informed by Ms. Olesen "of the contents of

the said Instrument" and after Mr. Konya had acknowledged to her that he was executing the

Agreement "freely and voluntarily for the uses and purposes therein mentioned."

> On November 21, 2000, Konya sent Martin a facsimile with his home address in Hungary

and a request for payment per the parties' Agreement.  *See* Exhibit A-18 attached to First Data's

Brief in Support of it Motion for Summary Judgment, at para. 20; Defendant's Opposition, at p.

3.  On December 5, 2001, Konya sent an e-mail to Templeton requesting that the original

Agreement be sent by mail to Konya's Hungarian address.  In the same e-mail, Konya inquired as

to the status of one of First Data's programs and expressed an interest "to re-license patent rights

from you," as well as his belief in "the strength of our possible cooperationship."  *See* Exhibit A-

21 attached to First Data's Brief in Support of it Motion for Summary Judgment, at para. 20;

Defendant's Opposition, at p. 3.

Martin has acknowledged that he was aware that Richard Litman, an attorney in

Arlington, Virginia, was identified on the first page of the '396 Patent as the prosecuting attorney

of record before the United States Patent and Trademark Office.  *See* First Data's Response to

Conservator's Motion for Partial Summary Judgment, at p. 7.  At some point, Martin wrote down

Litman's name and telephone number, but he denies any knowledge of an ongoing relationship

between Litman's law firm and Konya.  Martin also has testified that he has no recollection of

whether or not he contacted Litman.  On December 11, 2000, Richard Litman forwarded to Mr.

Martin at First Data's headquarters in Englewood, Colorado "a copy of file papers" pertaining to

the '396 Patent, as well as "the originals of the patent application receipt, office action and Notice

of Allowance paperwork"  In his letter, Mr. Litman acknowledged that Mr. Konya "has not

requested our involvement in this particular transaction."  *See* Exhibit A-22 attached to Plaintiff's

Brief in Support of its Motion for Summary Judgment. This letter apparently was in response to

two letters from Konya informing the Litman Firm of the Patent Assignment Agreement and

telling the Firm to anticipate communications from Martin or Templeton.  In his letters, Konya

advised the Litman Firm that he had entered into an exclusive license agreement with "Western

Union – First Data Corporation."  *See* Exhibits A-19 and 20 attached to Plaintiff's Brief in

Support of its Motion for Summary Judgment.

It is also undisputed that on June 18, 2003, Defendant Konya was placed under guardianship by the Town Court of Szentendre, Hungary.  *See* First Data's Response to Conservator's Motion for Partial Summary Judgment, at p. 2.  The order issued by the Court of Szentendre concluded that Defendant Konya was suffering from chronic schizophrenia characterized by delusions and that "[n]o positive change can be expected in the defendant's condition, due to the nature of his illness his condition is final."  The parties also acknowledge that Defendant Konya was taking the antipsychotic medication Risperdal during November 2000. *See* First Data's Response to Conservator's Motion for Partial Summary Judgment, at p. 3.

## ANALYSIS

I. *Plaintiff's Motion in Limine to Exclude Testimony of Dr. Zoltan Ziegler*

Plaintiff First Data has moved to exclude the proposed testimony of Dr. Zoltan Ziegler, one of the Conservator's designated expert witnesses.  First, Plaintiff argues that Dr. Ziegler's proposed testimony lacks the reliability required by Fed.R.Evid. 702.  According to First Data, Dr. Ziegler's opinions are based on unfounded assumptions that ignore the facts developed over the course of discovery in this case and contrary to "well-established principles of forensic psychiatry."  First Data also insists that Dr. Ziegler's testimony is not sufficiently tied to the facts in this case to be relevant, and therefore would not assist the jury to understand the evidence or to determine a fact in issue.

To place First Data's motion in context, the court notes Defendant Konya's long history of psychiatric evaluation and treatment.  *See* Resolution of Town Guardianship Office of Szentendre, Hungary, attached as Exhibit V to the Conservator's Motion for Partial Summary

Judgment.[3]  It appears that Mr. Konya's first psychiatric examination occurred in 1992 after being

charged with assaulting a public official.  That evaluation concluded that Defendant Konya had a

"hysteric personality disorder."  Thereafter, Defendant Konya received treatment at a series of

medical facilities.  In 1998, Defendant Konya was ordered to submit to another medical

examination.  The Semmelweis University of Medical Sciences found that Konya was suffering

from schizophrenia, accompanied by extreme mood swings.  In 1999, the Psychiatric Department

of the Szent Janos Hospital in Budapest diagnosed Defendant Konya as having a form of

schizophrenia combined with mood disorders.

On June 18, 2003, Defendant Konya was placed under guardianship by the Court of

Szentendre based upon a petition filed by Konya's parents.  *Id.*  Psychiatric reports prepared in

connect with the guardianship proceedings concluded that Defendant Konya was suffering from

chronic schizophrenia characterized by delusions.  In granting the requested conservatorship, the

Court of Szentendre found that Defendant Konya

> has been suffering from schizophrenia since his early youth and is also currently in
> a psychotic condition.  The defendant is led by his delusions, he is influenced by
> them in everything.  He repeatedly committed forensic acts, several expert
> opinions have classified as *non compos mentis*, . . . .  No positive change can be
> expected in the defendant's condition, due to the nature of his illness his condition
> is final . . .

*Id.*

Dr. Ziegler is a Hungarian psychiatrist who began treating Defendant Konya in 1994 after

diagnosing him as "paranoid with impaired impulsive conduct."  Dr. Ziegler continued to treat

---

[3]First Data concedes that the documents from the Town Court of Szentendre, Hungary
speak for themselves.  *See* First Data's Response to the Conservator's Motion for Partial
Summary Judgment, at p. 2.

Mr. Konya intermittently over the next decade on an in-patient and out-patient basis. According to his deposition testimony, Dr. Ziegler discharged Defendant Konya from Galfe Bela Gyogyito, a psychiatric and rehabilitation hospital in Pomaz, Hungary, in April 2000. Dr. Ziegler prescribed anti-depressant and mood enhancing medications for Mr. Konya in May 2000, after he shot himself in the head with an air pistol. Konya had requested medication that "would immediately improve his mood." Defendant Konya returned to Dr. Ziegler in June 2000, with a request for Zoloft, a different anti-depressant. It appears that Defendant Konya was re-admitted to Galfe Bela Gyogyito in July 2000 and treated for "mild depression" manifested by tension, lack of sleep and frequent headaches. In October 2000, the month preceding the First Data transaction, Dr. Ziegler wrote Defendant Konya a prescription for medication while he was traveling outside Hungary. Dr. Ziegler and the staff at Galfe Bela Gyogyito had no further involvement in Defendant Konya's care until June 2001, when the Conservator requested prescription medication for his son.

Dr. Ziegler has testified that in 2005, he changed Defendant Konya's diagnosis from paranoid schizophrenia to delusional psychosis. Dr. Ziegler has explained that a paranoid schizophrenic will have hallucinations as the main symptom and experience bizarre delusions as a reaction to those hallucinations. *See* Deposition of Dr. Zoltan Ziegler, at p. 62, attached as Exhibit A-3 to Conservator's Motion for Partial Summary Judgment. Over the course of several years, Dr. Ziegler concluded that Defendant Konya was not reporting hallucinations or other symptoms consistent with schizophrenia. Rather, Dr. Ziegler felt that Defendant Konya's delusions were more stable and more consistent with delusional psychosis disorder. According to Dr. Ziegler, while delusional psychosis is a more stable disease than paranoid schizophrenia, "it

10

advances slowly and take possession – takes possession over the patient and then infiltrates the personality – totally infiltrates the personality of the patient." *Id.* at pp. 80-82.  During his deposition, Dr. Ziegler conceded that his diagnosis of delusional psychosis is not shared by all of his colleagues at Galfe Bela Gyogyito.

> If permitted to testify at trial as an expert witness, Dr. Ziegler would opine:
>
> From my personal knowledge of Mr. Konya and his mental condition, before, during and after the relevant time frame, . . . that Mr. Konya suffers from delusional psychosis, which is characterized by the diagnostic criteria of the American Psychiatric Association (DSM-IV) as F22.0, a subcategory of schizophrenia (DSM-IV F20-29). . . . Therefore, in my medical opinion as a psychiatrist, Mr. Konya continually suffered from delusional psychosis during all the times he interacted with First Data Corporation, including when he signed the assignment . . . .  It is also my medical opinion as a psychiatrist that during all those times he was continually not able, as a result of his delusional psychosis and symptoms, to exercise the understanding, discretion and judgment that a normally functioning adult would have concerning the dealings with First Data Corporation.

*See* Expert Psychiatric Report and Opinion of Dr. Ziegler, attached as Exhibit A-1 to Plaintiff's Motion in Limine.

> Rule 702 of the Federal Rules of Evidence provides that:
>
> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

Rule 702 imposes three requirements for the admission of expert testimony.  First, the expert must be qualified by specialized knowledge, skill, experience, training or education to testify on the subject matter of his or her testimony.  Second, the testimony must be "'based upon sufficient facts or data,' 'the product of reliable principles and methods;' and the product of the reliable application of these principles and methods to the facts of the case." *Cook v. Rockwell*

*International Corp.*, 2006 WL 3533049, *3 (D. Colo. 2006) (Kane, J.).  Finally, the proffered

expert testimony must be relevant to an issue in the case and thereby assist the jury in its

deliberations.  The district court performs an important gatekeeping function in assuring that each

of these prerequisites is satisfied.  *Macsenti v. Becker*, 237 F.3d 1223, 1230-34 (10th Cir. 2001).

However, in discharging its gatekeeper responsibilities, the court remains mindful that "Rule 702

mandates a liberal standard" for the admissibility of expert testimony.  *Cook v. Rockwell

International Corp.*, 2006 WL 3533049 at *4.

The proponent of expert testimony has the burden of establishing the admissibility of the

expert's opinions under Rule 702.  *In re Breast Implant Litigation*, 11 F. Supp.2d 1217, 1222 (D.

Colo. 1998).  *See also Oddi v. Ford Motors Co.*, 234 F.3d 136, 144 (3rd Cir. 2000) (proponent of

expert testimony must satisfy Rule 702 requirements by preponderance of proof).  The decision to

admit or exclude expert testimony is reviewed for abuse of discretion.  *Summers v. Missouri

Pacific Railroad System*, 132 F.3d 599, 603 (10th Cir. 1997).

A.     Is  Dr. Zoltan Ziegler Qualified?

Plaintiff's motion *in limine* does not explicitly challenge Dr. Ziegler's qualifications to

serve as an expert witness in this case, instead to focusing on "the substantial shortcomings in the

reliability and relevance of Dr. Ziegler's opinion."  *See* Plaintiff's Motion in Limine, at p. 5.

However, First Data suggests that many of the flaws or shortcomings in Dr. Ziegler's analysis

"may partially be explained by the fact that Dr. Ziegler is a treating psychiatrist, not a forensic

psychiatrist" and by Dr. Ziegler's inexperience in conducting competency evaluations.  *Id.* at p.

16.  Citing ethical guidelines established by the American Academy of Psychiatry, First Data

concludes that Dr. Ziegler's continued role as Defendant Konya's treating psychiatrist should

disqualify him from serving as an expert witness in this case, given perceived conflicts in serving the same patient in both a forensic and clinical role. *Id.* at p. 17

Rule 702 does not impose an "overly rigorous" requirement of expertise, recognizing that expertise may be acquired through a broad range of experience, skills or training. *See United States v. Velasquez*, 64 F.3d 844, 849 (3rd Cir. 1995). The trial court should not exclude expert testimony simply because the court feels that the proffered witness is not the most qualified or does not have the specialization considered most appropriate by the court. *See Holbrook v. Lykes Brothers Steamship Co., Inc.*, 80 F.3d 777, 782 (3rd Cir. 1996). *Cf. Wooley v. Smith & Nephew Richards, Inc.*, 67 F. Supp.2d 703, 706-07 (S.D. Tex. 1999) (finding that the proffered medical expert had a "modest degree of specialized knowledge applicable to the claims made in this case"). The Tenth Circuit has acknowledged that "[a]s long as an expert stays 'within the reasonable confines of his subject area,' our case law establishes 'a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001) (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

Dr. Ziegler's *curriculum vitae* indicates that he received his medical degree in Romania in 1981 and his Hungarian medical certification in 1991. Dr. Ziegler apparently received specialized training in psychiatry in 1991 and in psychiatric rehabilitation in 2005. The witness' resume indicates that in 2001, he received post-graduate training in forensic psychiatry, but did not take the examination required for certification as a forensic expert. *See* Deposition of Dr. Zoltan Ziegler, at p. 50, attached as Exhibit A-3 to the Conservator's Motion for Partial Summary Judgment. Dr. Ziegler testified during his deposition that as part of his training in psychiatric

medicine, his instructors utilized the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") and he continues to use in the DSM-IV in his regular practice. *Id.* at pp. 99-100.[4] For the past 16 years, Dr. Ziegler has been employed as a physician in the general psychiatry department at a psychiatric and rehabilitation hospital in Pomaz, Hungary. Dr. Ziegler testified that he is often asked by court-appointed medical experts to provide opinions in his capacity as a treating physician. *Id.* at p. 51.

Dr. Ziegler's lack of professional experience as a forensic psychiatrist is not dispositive as to the issue of his qualifications and will not warrant his disqualification as an expert in this case. *Cf. Wheeler v. John Deere Co.*, 935 F.2d 1090, 1101 (10th Cir. 1991) (while conceding that plaintiff's psychiatrist "may not have been the optimal witness," held that his lack of specialization only affected the weight, not the admissibility of his testimony); *Colon ex. rel. Molina v. Bic USA, Inc.*, 199 F. Supp.2d 53, 73 (S.D.N.Y. 2001) (expert's training need not narrowly match the point of dispute in the case). Any shortcomings that First Data may perceive in Dr. Ziegler's academic or professional background are more properly addressed in cross-examination. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). The court finds that Dr. Ziegler has the necessary specialized knowledge to qualify as an expert witness under Rule 702.

---

[4]The Diagnostic and Statistical Manual, Fourth Edition, is a manual produced by the American Psychiatric Association that provides doctors with a system for diagnosing mental disorders. In essence, the manual lists the symptoms or elements of various disorders, and the doctor must find a designated number of those symptoms or elements in order to diagnose a disorder.

14

B.       Are Dr. Ziegler's Opinions Reliable?

First Data challenges the reliability of Dr. Ziegler's proposed testimony, arguing that his

opinions fail to conform to "well-established principles for conducting mental competency

evaluations in the field of forensic psychiatry." *See* Plaintiff's Motion in Limine, at p. 14.  Relying

on the contrary opinions of its own expert witness, Dr. Richard Martinez, First Data argues that

Dr. Ziegler's methodology falls short of forensic psychiatry standards because he failed to

consider specific information or data pertaining to Defendant Konya's mental state during the

period October-November 2000.  Plaintiff further contends that Dr. Ziegler's opinions are based

upon unfounded assumptions that are contradicted by other evidence developed through

discovery.

Although an expert witness is permitted wide latitude to offer opinions, including those

which are not based on first-hand knowledge or observation, the opinions must have a reliable

basis.  Under Rule 702, admissible expert testimony must be based on "actual knowledge and not

'subjective belief or unsupported speculation.'"  *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780

(10th Cir. 1999); *Wilson v. Petroleum Wholesale, Inc.*, 904 F. Supp. 1188, 1190 (D. Colo. 1995).

> In addressing the principles enunciated in *Daubert*, the Tenth Circuit has recognized
> proposed expert testimony must be supported by "appropriate validation – *i.e.,*
> 'good grounds,' based on what is known," . . . The plaintiff need not prove that
> the expert is indisputably correct or that the expert's theory is "generally accepted"
> in the scientific community.  Instead, the plaintiff must show that the method
> employed by the expert in reaching the conclusion is scientifically sound and that
> the opinion is based on facts which sufficiently satisfy Rule 702's reliability
> requirements.

*Mitchell v. Gencorp, Inc.*, 165 F.3d at 781 (citing *Daubert*, 509 U.S. at 590).  A trial court has

considerable discretion in determining whether particular expert testimony is reliable.  *Kumho Tire*

15

*Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

No single factor should be dispositive in weighing the reliability of an expert's opinions. *Ruiz-Troche v. Pepsi Cola of Puerto Rico*, 161 F.3d 77, 85 (1st Cir. 1998).[5] Ultimately, the court's inquiry must focus on three areas: (1) whether the expert's testimony is based on sufficient facts or data; (2) whether the expert used reliable principles and methodologies; and (3) whether the expert applied these principles and methods reliably to the facts of the case. *Cook v. Rockwell International Corp.*, 2006 WL 3533049 at *7. If the court concludes that an expert's testimony satisfies these evidentiary requirements of reliability, "it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of competing experts' opinions should be credited." *Id.* at *6.

As indicated in his expert report and deposition testimony, Dr. Ziegler's proposed opinions are based upon his medical training, his personal experience as Defendant Konya's treating physician, his review of medical records and findings prepared by other doctors, and his application of the diagnostic methodologies set forth in the DSM-IV. *Cf. McKnight v. Purdue Pharma Co.*, 422 F. Supp.2d 756, 759 (E.D. Tex. 2006) (in denying defendant's motion to strike plaintiff's medical expert, held that expert's use of the DSM-IV as the foundation of his opinions provided sufficient indicia of reliability; noted that "[d]iagnosis of a mental illness is typically made in reference to a standard which describes symptoms, such as the" the DSM-IV). *See also*

_____

[5]In assessing the reliability of a proffered opinion, the trial court may consider, *inter alia*: (1) whether the opinion is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002).

*Walker v. Soo Line Railroad Co.*, 208 F.3d 581, 588 (7th Cir. 2000) (acknowledging that "courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable").  Under the circumstances, I find sufficient indicia of reliability in Dr. Ziegler's proposed testimony to satisfy the evidentiary requirements of Rule 702.

First Data correctly notes that other physicians have reached different conclusions as to Defendant Konya's medical condition.  Indeed, Dr. Ziegler changed his own evaluation of Mr. Konya in 2005.  Plaintiff contends that "[b]y assuming that his current diagnosis of Konya is correct, Dr. Ziegler failed to account for the possibility that a different diagnosis of Konya's condition is proper."  *See* First Data's Motion in Limine, at p. 14.  However, it bears repeating that the requirement of reliability is "lower than the merits standard of correctness."  *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3rd Cir. 1994).  The goal under Rule 702 is reliability, not certainty.  "[E]ven if the judge believes there are better grounds for some alternative conclusion, and that there are some flaws in the scientist's methods, if there are good grounds for the expert's conclusion, it should be admitted."  *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Heller v. Shaw Industries*, 167 F.3d 146, 152-53 (3rd Cir. 1999)).  *See also Hose v. Chicago Northwestern Transport* Co., 70 F.3d 968, 976 (8th Cir. 1996 ) ("[a]lthough it is common that medical experts often disagree on diagnosis . . . , questions of conflicting evidence must be left for the jury's determination").  Any perceived flaws in Dr. Ziegler's testimony are more properly "tested in the crucible of the adversarial system," and do not provide justification "for truncating that process."  *Cf. United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996).

C.      Are Dr. Ziegler's Opinions Relevant?

17

Finally, Plaintiff challenges the relevance of Dr. Ziegler's proposed testimony.  First Data suggests that Dr. Ziegler's opinions on competency lack the necessary "fit" to satisfy Rule 702 based upon his failure to consider the specific circumstances attendant to Defendant Konya's interactions with First Data or Mr. Konya's particular behavior in November 2000 and immediately thereafter.  *See* Plaintiff's Motion in Limine, at p. 8.

Even if an expert is deemed qualified and his or her opinions are considered reliable, admissibility still requires a determination that the opinions are relevant.  The court must consider "whether expert testimony . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)).  Courts have routinely excluded expert testimony that was based on nothing more than speculation.  *See, e.g., Jetcraft Corp. v. Flight Safety International*, 16 F.3d 362, 366 (10th Cir. 1993) (expert testimony excluded as professional speculation); *Eastridge Dev. Co. v. Halpert Associates, Inc.*, 853 F.2d 772, 783 (10th Cir. 1988) ("under the circumstances of this case, including the tentative and speculative nature of the [expert] witness' proposed testimony, we find that the exclusion of such evidence was not an abuse of discretion").  While First Data may question the thoroughness of Dr. Ziegler's evaluation, it would be incorrect to suggest that his proposed testimony is based solely on speculation.  Similarly, the existence of contradictory evidence does not presumptively render Dr. Ziegler's opinions unreliable or irrelevant for purposes of Rule 702.  *Cf.  Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) (in denying a motion to strike plaintiff's expert psychiatrist based upon inconsistencies between plaintiff's own testimony and the facts cited in the doctor's report, court held that the jury was free to credit or not to credit the expert's diagnosis and

testimony).

"Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Cook v. Rockwell International Corp.,* 2006 WL 3533049 at *5 (quoting *Robinson v. Mo. Pac. R.R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994)).

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

*Bonner v. ISP Tech., Inc.*, 259 F.3d at 929-30.  Any perceived weaknesses in Dr. Ziegler's testimony should be addressed by the trier of fact with the benefit of vigorous cross-examination. This court will not presume to usurp the fact finding role of the jury.

On balance, I conclude that Dr. Ziegler's proffered opinions are both reliable and relevant to the jury's understanding of the evidence and determination of disputed issues, and should be admitted under Rule 702.  Accordingly, I recommend that First Data's Motion in Limine to Exclude Testimony of Dr. Zoltan Ziegler be denied.

II.     *Defendant and Counterclaim Plaintiff's Motion for Partial Summary Judgment*

The Conservator has moved for partial summary judgment on the First Claim in his Amended Counterclaim which seeks an order declaring the Patent Assignment Agreement void and unenforceable under Hungarian law.  The Conservator's motion argues that the parties' own chosen law, Colorado, should not apply as the transaction and parties have no substantial relationship with Colorado and Colorado law would be contrary to the fundamental policies of

19

Hungary.

With subject matter jurisdiction based upon the diversity of the parties, this court must apply the choice of law principles of Colorado, the forum state. *See Klaxon Co. v. Stentor Electric Manufacturing*, 313 U.S. 487, 497 (1941). Colorado has adopted the choice of law principles set forth in the Restatement (Second) of Conflict of Laws, and will apply the law of the state having "the most significant relationship" to the particular issue in dispute. *Wood Brothers Homes, Inc. V. Walker Adjustment Bureau*, 601 P.2d 1369, 447-48 (Colo. 1979). In contract actions, Section 187 of Restatement (Second) provides that the law of the state chosen by the parties to govern their contractual rights will be applied unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*See* Restatement (Second) of Conflict of Laws, § 187(2). Here, the Patent Assignment Agreement states that it will be governed by the laws of Colorado. Section 187 recognizes that the parties' chosen law should be applied unless the court determines that Colorado has "no substantial relationship to the parties or the transaction," or the court concludes that application of Colorado law "would be contrary to a fundamental policy" of a state with a materially greater interest.

In arguing that the selection of Colorado law does not meet the substantial relationship test of Section 187, the Conservator notes that Konya had contacts with Western Union employees in New Jersey, corresponded with a different Western Union representative in Atlanta,

20

and physically met with Plaintiff's representatives in New York.  The Conservator further notes that a draft agreement was sent by facsimile to Hungary and that his son executed the Patent Assignment Agreement in Hungary, which was also where the purchase price was wired.  The Conservator argues that the court should summarily reject the "arbitrary selection of Colorado law."  Unfortunately, this argument flies in the face of the Restatement (Second) and well-established case law in the District of Colorado.

The Comments accompanying Section 187 acknowledge that "[w]hen the state of the chosen law has some substantial relationship to the parties or the contract, the parties will be held to have had a reasonable basis for their choice."  The "substantial relationship" requirement is satisfied if one of the parties has its principal place of business in the state of the chosen law.  *See* Comment F to *Restatement (Second) of Conflict of Laws* § 187.  *Cf. American Express Financial Advisors, Inc. v. Topel*, 38 F. Supp.2d 1233, 1238 (D. Colo. 1999) (finding good reason for the parties' choice of Minnesota law because plaintiff's principal place of business was in Minnesota); *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F. Supp. 1048, 1050 (D. Colo. 1985) (Kane, J.) (holding that the parties' contractual selection of Ohio law was reasonable as defendant's principal place of business was in Ohio and defendant's performance took place there); *Hansen v. GAB Business Services, Inc.*, 876 P.2d 112,  113 (Colo. App. 1994) (the parties' agreement stated it would be governed by New York law; although neither party was located in New York at the time of the litigation, the court concluded that a reasonable basis existed for applying New York law since defendant previously was headquartered there for many years and conducted business nationwide).  *See also Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 706 (7th Cir. 2004) (held that since the employer's principal place of business was Tennessee, the

"sufficient relationship" requirement was satisfied and Tennessee law governed).

Colorado has a substantial relationship to the parties' dispute. Dallas Martin, the First Data employee "responsible for FDC/Western Union intellectual properties" and one of the individuals who negotiated the Patent Assignment Agreement, is based in Englewood, Colorado, First Data's principle place of business. At First Data's request, the '396 Patent files were transferred to Mr. Martin in Denver. Given these undisputed facts, I find that Colorado has a substantial relationship to the parties and the Agreement such that the parties' choice of law should be enforced unless the requirements of Section 187(2)(B) are met.

In that regard, the Conservator argues that application of Colorado law would be contrary to a fundamental policy of Hungary, the state which he insists has a materially greater interest in the determination of the competency issues in this case and which the Conservator contends would be the state of the applicable law in the absence of an effective choice of law by the parties. In support of this position, the Conservator relies on Section 17 of the Hungarian Civil Code, which purportedly provides that a contract may be invalidated based upon a party's "full and continuous lack of mental capacity at the time of entering into the transaction." *See* Expert Report of Professor Anna Halustyik, attached at Exhibit B-1 to the Conservator's Motion for Partial Summary Judgment. The Conservator contends that application of Colorado law in this case would contravene Hungary's fundamental interest in protecting its mentally ill citizens from the unfair burdens of contracts that would not be valid in Hungary. *See* Conservator's Motion for Partial Summary Judgment, at p. 12.

However, Colorado law also recognizes that an agreement may be invalidated by a party's lack of contractual capacity. Under Colorado law, the legal test is whether the party in question

22

"was incapable of understanding and appreciating the extent and effect of business transactions in which he engaged." *Hanks v. McNeil Coal Corp.*, 168 P.2d 256, 260 (Colo. 1946).[6]

> One may have insane delusions regarding some matters and be insane on some subjects, yet capable of transacting business concerning matters wherein such subjects are not concerned, and such insanity does not make one incompetent to contract unless the subject matter of the contract is so connected with an insane delusion as to render the afflicted party incapable of understanding the nature and effect of the agreement or of acting rationally in the transaction.

*Id.* Nothing suggests that Colorado is any less inclined than Hungary to protect the interests of an individual who truly lacks the mental capacity to enter a contract.

Section 187(2)(B) requires a substantial and material conflict to justify a departure from the parties' chosen law. I conclude that application of Colorado law will not abridge a "fundamental policy" of Hungary or preclude the Conservator from asserting Konya's lack of contractual capacity. *Compare Pirkey v. Hospital Corp. of America*, 483 F. Supp. 770, 774-75 (D. Colo. 1980) (Kane, J.) (holding that application of Saudi Arabian law on the issue of measure of damages raised problems of fundamental due process serious enough to require the application of Colorado law) and *United Rentals, Inc. v. Pruett*, 296 F. Supp.2d 220, 230-31 (D. Conn. 2003) (in applying California law, rather than the parties' contractual choice of Connecticut law, court noted that Connecticut enforces certain employment contracts restricting the mobility of employees and the exercise of free competition, while California law generally prohibits covenants not to compete and strongly favors employee mobility).

This court will not eschew the parties' contractual choice of law simply because Colorado

---

[6]In *Hanks*, the conservator sought to set aside a contract his father had executed with the defendant coal company. The father been adjudicated insane three years after entering the contract in question and the conservator was attempting to establish that his father's incapacity dated to the time of the contract.

and Hungary do not employ an identical standard for determining legal competency to contract. *Cf. Demitropoulos v. Bank One Milwaukee*, 915 F. Supp. 1399, 1402 (N.D. Ill. 1996) (held that any differences in the scope of Wisconsin and Illinois statutes did not implicate any public policy concerns that were sufficiently strong or of such a fundamental nature as to justify overriding the parties' contractual choice of law). *See also Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 739 (6th Cir. 1999) (in enforcing the parties' contractual choice of Ontario law, held that the possibility of a different result under the forum state's law did not suffice to show that Ontario law was repugnant to a fundamental policy of the forum state); *Intermetro Industries Corp. v. Kent*, 2007 WL 518345, *3 (M.D. Pa. 2007) (holding that Pennsylvania's law on covenants was not "contrary to a fundamental policy" of Texas simply because Texas and Pennsylvania courts disagree on what constitutes sufficient consideration for a covenant not to compete).

Thus, having applied the alternative analyses under Section 187(2)(a) and (b), the court finds that the parties' chosen law, Colorado, should govern the Patent Assignment Agreement and the instant litigation. Accordingly, the court recommends that the Conservator's Motion for Partial Summary Judgment be denied to the extent it seeks a holding that Hungarian law controls in this action.

III.    *Plaintiff's Motion for Summary Judgment*

First Data seeks an order upholding the Patent Assignment Agreement between First Data and Konya as valid and enforceable, and dismissing all of the Conservator's counterclaims. Conversely, the Conservator's Motion for Partial Summary Judgment argues that if Hungarian law does not apply, the Patent Assignment Agreement is invalid under Colorado law because

Konya was incapable of understanding and appreciating the extent and effect of, or acting rationally in connection with, the subject transaction.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir.1991); *Devery Implement Company v. J.I. Case Company,* 944 F.2d 724, 726 (10th Cir.1991); *Ash Creek Mining Co. v. Lujan,* 934 F.2d 240, 242 (10th Cir.1991); *Continental Casualty Co. v. P.D.C., Inc.,* 931 F.2d 1429, 1430 (10th Cir.1991). The moving party bears the initial burden of showing that there is an absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). The movant need not negate the non-movant's claim, but must only point to an absence of evidence to support the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. at 325; *John Hancock Mut. Life Ins. Co. v. Weisman*, 27 F.3d 500, 503 (10th Cir. 1994); *Universal Money Ctrs., Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994). If the moving party meets this burden, the non-moving party may not rest upon its pleadings, but must come forward with specific facts showing that there is a genuine issue for trial as to the elements essential to the non-moving party's case. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986).

The court must construe the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party. *Kidd v. Taos Ski Valley, Inc*., 88 F.3d 848, 851 (10th

25

Cir. 1996).  The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251-52.  Evidence that is not significantly probative and immaterial factual disputes will not defeat a motion for summary judgment.  *Ayon v. Gourley*, 47 F. Supp.2d 1246, 1252 (D. Colo.1998).  The demonstration of "some metaphysical doubt as to the material facts" is not sufficient to establish a genuine issue of material fact. *Foreman v. Richmond Police Department*, 104 F.3d 950, 957 (7th Cir. 1997).

In moving for summary judgment on its affirmative claim for relief, First Data invokes the common law presumption that "[e]very person is presumed by the law to be sane and competent for the purpose of entering into a contract." *See* Plaintiff's Motion for Summary Judgment, at p. 27 (quoting *Forman v. Brown*, 944 P.2d 559, 562 (Colo. App. 1996)).  Plaintiff notes that the Conservator bears the burden of overcoming this presumption by showing that Defendant Konya "was incapable of understanding and appreciating the extent and effect of business transactions in which he engaged." *See* Plaintiff's Motion for Summary Judgment, at p. 27 (quoting *Hanks v. McNeil Coal Corp.*, 168 P.2d at 260.  First Data contends that Dr. Ziegler provides the only evidence to support the Conservator's position that Defendant Konya lacked the requisite mental capacity to contract.  By discounting entirely the opinions expressed by Dr. Ziegler, First Data reasons that a judgment must be entered in its favor in the absence of any genuine issue of material fact concerning Defendant Konya's contractual capacity.

Weighing all of the information presently before the court, I will echo the comments of Judge Kane in an earlier case dealing with issues of mental competency:

I make no pretense to have the need or ability to judge the mental competency or

> incompetency of plaintiff at this stage in the proceedings, nor would determination
> of the summary judgment motion before me be the correct vehicle by which to do
> so.  At this point, it is not the place of this court to weigh conflicting expert
> testimonies as to plaintiff's mental capabilities over the past four years.

*Carabello v. Crown Controls Corporation*, 659 F. Supp. 839, 841 (D. Colo. 1987) (Kane, J.).

*Cf. Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984)

(noting that "[s]ummary judgment is generally inappropriate when mental state is an issue, unless

no reasonable inference supports the adverse party's claim").  With the benefit of all the relevant

evidence, including the opinions of Drs. Ziegler and Martinez, the jury should decide Defendant

Konya's mental competency to negotiate and execute the Patent Assignment Agreement.

Accordingly, I recommend that the District Court deny that portion of Plaintiff First Data's

Motion for Summary Judgment that requests an order upholding the Agreement between First

Data and Konya as valid and enforceable.  I also recommend denial of the Conservator's Motion

for Partial Summary Judgment as to his First Claim for declaratory relief.

First Data also challenges the Conservator's Third Claim for unjust enrichment.  To

prevail on that claim, the Conservator must prove that: (1) at Arpad Konya's expense, (2) First

Data received a benefit, (3) under circumstances that would make it unjust for First Data to retain

the benefit without paying.  *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1221 (10th Cir.

2004).  The Colorado Supreme Court has held that the third element of an unjust enrichment

claim requires proof of "some improper, deceitful or misleading conduct" by the party defendant.

*DCB Construction Co., Inc. v. Central City Development Co.*, 965 P.2d 115, 117 (Colo. 1998)

(*en banc*).  First Data argues that it is entitled to summary judgment on the Conservator's claim

for unjust enrichment, in the absence of any evidence that First Data engaged in improper,

deceitful or misleading conduct in relation to the transaction with Arpad Konya.  First Data also argues that the Conservator cannot show that First Data received any benefit as a result of the Patent Assignment Agreement.

As the party opposing summary judgment, the Conservator cannot rest on mere allegations or vague statements.  Rather, the Conservator must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [he] carries the burden of proof."  *Simms v. Oklahoma ex rel. Department of Mental Health*, 165 F.3d 1321, 1326 (10th Cir. 1999).  Speculation will not suffice to raise a genuine issue of material fact.  *Webb v. Level 3 Communications, LLC*, 167 Fed.Appx. 725, 733 (10th Cir.), *cert. denied*, 127 S.Ct. 72 (2006).  I find that the Conservator has not sustained his burden under Rule 56 as to his claim for unjust enrichment.  *See Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993) (holding that summary judgment may be granted if the non-moving party offers a "mere scintilla of evidence" or if the evidence is "merely colorable or is not significantly probative").

As evidence of "unjust" circumstances surrounding the negotiation of the Patent Assignment Agreement, the Conservator points to Mr. Martin's alleged failure to identify himself as a lawyer during the course of negotiations, as well as Martin's failure to contact Mr. Konya's patent lawyer prior to execution of the Agreement.  Notably, the Conservator cites no legal authority to support his claim that Mr. Martin engaged in unjust or improper practices.  Rule 4.2 of the Colorado Rules of Professional Conduct prohibits a lawyer from communicating with a person known to be represented by counsel "about the subject of the representation."  The Conservator presents no facts that would suggest Mr. Martin had any reason to believe that the Litman Firm was representing Konya in connection with the Patent Assignment Agreement.  To

the contrary, Richard Litman advised Martin on December 11, 2000 that Mr. Konya had not requested his firm's involvement in the negotiations surrounding the Patent Assignment Agreement. *See* Exhibit A-22 attached to First Data's Brief in Support of its Motion for Summary Judgment.

Similarly, the Conservator cannot rely on Rule 4.3 of the Colorado Rules of Professional Conduct, which provides that "in dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall state that the lawyer is representing a client and shall not state or imply that the lawyer is disinterested." Rule 4.3 also prohibits a lawyer from giving legal advice to an unrepresented person other than to secure counsel. The Conservator has not come forward with evidence to suggest that Arpad Konya misperceived Martin's role in the parties' negotiations. The undisputed facts show that Mr. Konya initiated discussions concerning a possible business deal with Western Union Financial Services, a First Data subsidiary, and that Mr. Konya continued to press his interest in subsequent communications with First Data representatives. It is also undisputed that Mr. Konya was told that Dallas Martin was "responsible for FDC/Western Union intellectual properties," and that Mr. Martin would be advising First Data about any opportunities that might flow from discussions with Mr. Konya. I find nothing to suggest that Mr. Martin misrepresented his role in the negotiations or that Mr. Martin improperly gave Konya legal advice. Under the circumstances, the Conservator has not come forward with sufficient evidence to suggest a violation of Rules 4.2 and 4.3, or any misleading or improper conduct on the part of First Data. I find no genuine issue of fact as to the third element of the Conservator's claim for unjust enrichment.

The Conservator would have the court infer improper or misleading conduct based on the

fact that First Data apparently paid $10,000,000 to acquire business interests and intellectual property rights belonging to EDS. However,

> [w]hether plaintiff received what he considers a "fair" price is immaterial – he received the consideration contemplated by the written contract. Having received the benefit of the bargain he agreed to, plaintiff has made no showing that there are inequitable circumstances justifying his claim of unjust enrichment.

*Monus v. Colorado Baseball 1993, Inc.*, 1996 WL 723338, *15 (10th Cir. 1996) (disclaiming an intent to permit recovery under an theory of unjust enrichment where there is an express contract that has been fully performed).

In addition, the Conservator contends that the Patent Assignment Agreement conferred a benefit upon First Data, in the form of "practical control" of the '396 Patent. *See* First Amended Counterclaim, at ¶ 38. The Conservator maintains that First Data's acceptance and continued retention of this Patent "without payment of its fair value to Konya is inequitable." *Id.* at ¶ 39. However, the Conservator offers no factual support for this position and makes no attempt to quantify the "benefit" conferred upon First Data. *Cf. PPI-II, LLC v. Goodroe Healthcare Solutions, LLC*, 2006 WL 2506574, *2 (D. Colo. 2006) (Kane, J.) (noting that plaintiff's right to disgorgement of benefits under a theory of unjust enrichment "will be limited by its ability to prove that [defendant] enjoyed a quantifiable financial benefit"). *See also Carr Office Park, LLC v. Charles Schwab & Co., Inc.*, 2007 WL 1686741, *10 (D. Colo. 2007) (holding that defendant was entitled to summary judgment on plaintiff's claim for unjust enrichment, in part, because plaintiff had presented no evidence of what the fair market value of the alleged "benefit" might be).

Finally, First Data has moved for summary judgment as to the Conservator's second claim

for equitable relief.  First Data contends that this claim, which is not support by Colorado law,

simply seeks relief that is co-extensive with the Conservator's claim for unjust enrichment.  The

Conservator's response brief does not address or refute the merits of First Data's argument.  To

the contrary, the Conservator has expressed a willingness "to dismiss [his] Second Counterclaim

without prejudice to the later assertion of patent infringement and related claims following the

Guardian's recovery of the patent."  *See* Conservator's Opposition to Plaintiff's Motion for

Summary Judgment, at p. 11.  To date, the Conservator has not affirmatively moved under

Fed.R.Civ.P. 41 for dismissal of this particular claim.  More importantly, the Conservator offers

no compelling argument for dismissal of his second claim without prejudice.  *Cf. The Shaw Group*

*Inc. v. Picerne Investment Corp.*, 235 F.R.D. 68, 69 (W.D. Pa. 2005) (in denying plaintiff's

motion for voluntary dismissal without prejudice, noted that plaintiff had not acted diligently in

seeking the requested dismissal, had offered no explanation for the requested dismissal without

prejudice, and had subjected defendants to substantial expenses in defending plaintiff's claims);

*McNamara v. National Credit Union Administration*, 264 F. Supp.2d 1, 4 (D.D.C. 2002) (denied

plaintiff's motion to dismiss without prejudice after noting the time and resources defendant had

already devoted to the litigation and the potential for future litigation); *Schandelmeier v. Otis*

*Division of Baker-Material Handling Corp.*, 143 F.R.D. 102, 103 (W.D. Pa. 1992) (holding that

dismissal with prejudice was appropriate where plaintiffs moved to dismiss their complaint after it

had been pending for 20 months, failed to explain why they sought dismissal without prejudice,

and provided no opposition to defendants' dispositive motion).  Under the circumstances,

judgment should be entered for First Data on the second claim for relief.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that:

1.      First Data's Motion in Limine to Exclude Testimony of Dr. Zoltan Ziegler (doc. # 75), filed on December 20, 2006, be DENIED;

2.      Defendant and Counterclaim Plaintiff's Motion for Partial Summary Judgment (doc. # 77), filed on January 2, 2007, be DENIED; and

3.      Plaintiff First Data Corporation's Motion for Summary Judgment (doc. # 72), filed December 29, 2006, be GRANTED as to Counterclaim Plaintiff's Second Claim for equitable relief and Third Claim for unjust enrichment.  I recommend that judgment be entered in favor of Plaintiff First Data as to those claims.  In all other respects, Plaintiff's Motion for Summary Judgment should be DENIED.


**Advisement to the Parties**

Within ten days after service of a copy of the Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).

The district judge shall make a *de novo* determination of those specific portions of the proposed findings or recommendations to which specific objection is made.  28 U.S.C. § 636(b)(1).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.  *See In re Griego*, 64 F.3d at 583; *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  The district judge may accept, reject, or modify, in whole

or in part, the findings or recommendations made by the magistrate judge.  28 U.S.C. § 636(b)(1).

"[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *One Parcel of Real Property*, 73 F.3d at 1060.  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (district court's decision to review a magistrate's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *One Parcel of Real Property*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review);  *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc*., 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado this 26th day of June, 2007

BY THE COURT:


     s/Craig B. Shaffer
United States Magistrate Judge