IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 04-cv-00856-JLK-CBS

FIRST DATA CORPORATION,
a Delaware corporation,

   Plaintiff,

v.

ARPAD KONYA, an individual,
ARPAD KONYA, SR., as Legal Representative of Arpad Konya, and
HYPER-CASH INCORPORATED, a defunct New York corporation,

   Defendants.

## MEMORANDUM OPINION AND ORDER

Kane, J.

  This civil action involving the sale of a patent was originally filed for declaratory judgment and tried on the counterclaim for rescission. Jurisdiction is not contested and appropriate under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of costs and interest, and the citizenship of the parties is diverse. The substantive law of Colorado applies. Trial to the court sitting without a jury was held for six days beginning March 7, 2008. Following the taking of testimony, an adjournment was declared to afford the parties time to submit written summations and post-trial briefs in lieu of closing arguments. Now being fully advised, I make the following findings of fact, conclusions of law and order in this memorandum opinion.

I.

This case was originally filed on April 26, 2004, by First Data Corporation against Arpad Konya and Hyper-Cash Inc. for declaratory judgment pursuant to 22 U.S.C. § 2201 *et seq.* A first amended complaint before service of process was filed on September 28, 2004 adding Arpad Konya, Sr., as legal representative of Arpad Konya, Jr., and a John Doe defendant because First Data, after diligent search, was unable to identify the ownership of Hyper-Cash.

Service of process was waived on November 10, 2004. On December 13, 2004 disclosure was made that Hyper-Cash Incorporated is a defunct New York corporation and that its only shareholder was the defendant Arpad Konya (Jr.). John Doe is no longer necessary as a defendant and is therefore stricken as a party. On January 6, 2005, the defendants filed an answer and counterclaim against the Konyas for conversion, misrepresentation, breach of contract and rescission.

First Data moved to dismiss the counterclaim for failure to state a claim upon which relief could be granted. Arpad Konya, as guardian and conservator, dismissed all claims in the counterclaim and then filed an amended counterclaim for declaratory judgment invalidating the agreement between plaintiffs and Arpad Konya, Jr., equitable relief and unjust enrichment.

Upon completion of discovery, First Data moved for summary judgment on its claim for declaratory judgment and against Arpad Senior's counterclaims. I adopted the recommendation of Magistrate Judge Craig Shaffer and granted summary judgment for

First Data on the counterclaims for equitable relief and unjust enrichment, but denied each side's requests for declaratory judgment regarding the validity of the agreement for purchase and sale of the patent. Those requests were set for trial, and my findings and conclusions are set forth below.

II.

In February 2000, Arpad Konya, Jr., sent a letter to Western Union Financial Services Inc., which at that time was a subsidiary of First Data Corporation, stating that he had a patented concept of which he was the sole named inventor that could be of use to Western Union. The patent relates to methods and systems for the transfer of cash between automated teller machines. The letter wended its way through the corporate structure to First Data, which began negotiations with the junior Konya for assignment of the patent. In November 2000 the negotiations culminated in First Data and Konya, Jr., entering a three and a half page patent assignment pursuant to which First Data paid Konya, Jr., and his corporation, Hyper-Cash, $200,000 (U.S.) for transfer of all right, title and interest in and to the patent. There is no issue about the terms of this agreement or the validity of the patent.

After the assignment and receipt of payment, Konya, Jr., made further inquiries of First Data, soliciting other business opportunities. These inquiries extended intermittently for a few years, but were not productive of further business ventures between the parties. Konya, Jr.'s, contacts continued and evolved into threats of litigation and demands for increased compensation over and above the $200,000 paid for the assignment. In the

3

Spring of 2004, Konya, Jr., by then communicating through counsel demanded $50 million (U.S.) and reassignment of the patent from First Data to Konya, Jr., and asserted the claim that Konya, Jr., lacked the necessary mental capacity to enter the agreement for assignment of the patent.

Konya, Jr., was thereafter adjudicated by an Hungarian court as mentally incompetent and unable to manage his own business affairs. That court found Konya, Jr., suffers from schizophrenia and is influenced by delusions in everything he does and indeed was so at the time of execution of the subject contract. Several experts, the court states, "have classified him as *non compos mentis*" and opined that, due to the nature of his illness, his condition is final. Neither First Data nor any other party contested these proceedings.

At trial no evidence was presented as to an appraised value of the subject patent. The testimony of First Data's principal negotiator in the transaction, Charleton Templeton, was that the purchase of the patent was "defensive," *i.e.,* that First Data did not intend to use it, but rather to own the patent so as to prevent its competitors from acquiring and using it. There is no evidence that the purchase price was unconscionable. Rather, the evidence is unequivocal that Konya, Jr., met with Templeton and another representative of First Data, Dallas Martin, at a dinner meeting in New York City. Konya, Jr., was accompanied by two other individuals, Samuel Feldman and Hersham Saleh.

The only indication of abnormality presented was somewhat ideosyncratic in that

4

Konya, Jr., brought his own food to the hotel dining room. Other than that, the evidence is clear that Konya, Jr., negotiated with considerable skill. He demonstrated a knowledge of the money transfer marketplace, revenue opportunities, global aspects of the business, awareness of First Data's competitors, and how best to monetize his patent. Most significantly, Templeton observed a shrewd business tactic of advising First Data that he was also negotiating with its competitors about their acquiring the patent. He was clearly aware that the assignment of the patent constituted a permanent transfer as he talked about obtaining a license from First Data to use the patent after the assignment. To Templeton, a sophisticated and experienced business executive, it was clear that Konya, Jr., presented a complex business strategy to sell the patent and then, if he developed further ideas, to have additional business dealings with First Data.

## III.

The sole issue to be tried is whether Arpad Konya, Jr., possessed the requisite mental capacity to enter the agreement. Under Colorado law, a party claiming a contract is void for lack of mental capacity or competency has the burden to overcome the presumption that each party is sane and competent to contract and must prove that the party whose mental capacity is put in question did in fact lack the requisite mental capacity to contract *at the time the parties entered the contract*. (Emphasis added.) A *post hac* competency proceeding in which a guardian is appointed does not relieve the party of that burden of proof though it may be received in evidence in support of that burden. The test is whether Arpad Konya, Sr., meets that burden by sufficient evidence

5

that Arpad Konya, Jr., was incapable of understanding and appreciating the extent and effect of the business transactions in which he was engaged at the time of the transaction.

Under Colorado law, a person can be incompetent or insane for some purposes and yet retain the capacity to contract provided any insane delusion experienced by the party does not prohibit that party from understanding the nature and effect of the agreement in question. Based upon a full review of the documents and submitted transcripts of deposition testimony of various witnesses, the testimony at trial of all the witnesses, the stipulations of the parties and the arguments and written submissions of counsel, I find that the defendants have failed to meet the required burden and thus grant judgment for First Data Corporation. Moreover, the evidence, especially the expert testimony, established convincingly that at the time the parties entered the contract, Arpad Konya, Jr., understood and appreciated the extent and effect of the agreement and transactions in which he was engaged and therefore the defendants are bound by that agreement.

IV.

Despite the narrowing of the controversy to a single issue, this case presented difficulties for the court, counsel and the parties because of language differences. Arpad Konya, Sr., Arpad Konya, Jr., and psychiatric expert Dr. Zoltan Ziegler are residents and natural born citizens of Hungary. Numerous exhibits were written in Hungarian and translated into English. While both Konyas and Dr. Ziegler can speak, read and write in English, none is a native speaker nor has the linguistic facilities in English of a native speaker. It was thus necessary to have a Hungarian translator present and working

throughout the trial. Though doing an admirable job, the translator was not completely familiar with legal, medical and psychiatric terms and concepts and thus each party provided contemporaneous translation assistance by lawyers who are native speakers of Hungarian and possess that same level of fluency in English. Necessarily there were interruptions in the questions and answers of witnesses as the translations of subtle nuances and ambiguities in language and concepts were worked out. Nevertheless, I find the language difficulties were in fact surmounted and I believe my understanding of the testimony and issues is not diminished by them.

V.

It is undisputed that Arpad Konya, Jr., is and has been afflicted with, severe physical and mental disorders. He is an insulin dependent diabetic and has a chronic psychotic mental illness which has been most often described as schizophrenia or schizoaffective or delusional disorder. These labels or classifications, however, are accompanied by considerable caution when used by mental health professionals. My impression derived from the testimony is that classifying mental diseases and disorders with taxonomic rigidity is an artifact and that present day medical practice eschews categorizing people with such labels and much prefers a more dynamic methodology that focuses on behaviors. For that reason, these findings will not dwell on precise diagnoses. It is sufficient to say that virtually every person in this case, lay and expert, agrees that Arpad Konya, Jr., is seriously mentally ill and the evidence shows, I find, that he, too, is aware of his own illness. What else is beyond dispute is that Arpad Konya, Jr., is an

7

exceedingly intelligent person; indeed he has superior intelligence.

The essential controversy is whether his psychosis is progressive or waxes and wanes with times during which he is competent and others in which his disease makes it impossible for him to understand and perform according to acceptable definitions of normality. By that I mean, and do not intend to disparage, as an example, that feelings of being persecuted can range from healthy reactions to one's surroundings to exaggerated responses to stimuli for which a social consensus obtains that the responses are neither justified nor compatible with appropriate social functioning. For another example, religious beliefs can range from infantile delusions to articulable and reasonable explanations of observable data. Both of these examples are present to some degree in the case of Arpad Konya, Jr., as indeed they are in all of us.

The implicit psychological issues are further complicated by the development of psychotherapeutic medications. While the medical experts in this case disagree on whether Arpad Konya Jr.'s psychosis is steadily and progressively worsening or whether it waxes and wanes depending on stress levels, medications and mood changing events, both of the experts testifying recognize that medications, particularly Resperdal and Zoloft, subdue agitated and aggressive behaviors, tranquilize the patient and stabilize mood swings. When Arpad Konya, Jr., is taking his prescribed medications, and controlling his diabetes by insulin injections, appropriate diet and rest, his underlying mental illness does not control his behavior. In other and less elegant terms, when he is following his prescribed treatment, he is on track, but when he fails to follow his regimen,

he is very likely to leave the track. He returns to more normal behaviors when he resumes the regimen.

In reviewing the medical records, I find that many of his psychotic episodes are related to the times when he has been hospitalized for treatment of his diabetes. There doesn't seem to be a direct chemical connection, though such cannot be discounted, but the physical stress of insulin insufficiency or blood sugar imbalance apparently exacerbates the psychotic symptoms. The Hungarian court records indicate that at times from 1994 onward Konya, Jr., was hospitalized with acute psychosis but then released from hospital care. The records also reflect that his treating psychiatrist, Dr. Ziegler, opined in official documents that Konya, Jr., was indeed competent to have a driver's license provided he continue treatments and attend regular follow-up appointments. Moreover, in 1998 two Hungarian forensic psychiatrists, Drs. Gaal and Nagy, reported to the court that Konya, Jr., was exhibiting signs of active psychosis and that criminal proceedings against him should be suspended until his condition improved. In 2000 these same doctors reported that Konya, Jr. exhibited no signs of active psychosis and he was competent to stand trial. Dr. Ziegler agreed with that finding. Thus, the evidence from examining forensic psychiatrists and the attending psychiatrist, Dr. Ziegler, establish that Konya, Jr.'s mental condition waxes and wanes and improves to the point of competency when he complies with his treatment regimens. More to the point, there is no evidence at all to show that at the time of the execution of the agreement on November 17, 2000 Konya, Jr., was not following his prescribed regimen and in fact taking the medications

9

which render him functioning and competent.

## VI.

Finally, I must make a determination of which expert psychiatric opinion is the most credible. I find that Dr. Martinez's testimony is the most persuasive. First, Dr. Ziegler is Konya, Jr.'s treating psychiatrist. Irrespective of whether the standards of the American Academy of Psychiatry and the Law to the effect that a psychiatrist should not serve as both a treating physician and a forensic specialist with respect to the same subject individual apply to Hungarian doctors, the underlying principles of the standards do. A person cannot serve two masters, and a psychiatrist cannot credibly serve as both an objective appraiser of the diagnosis and prognosis in a forensic role as advisor to a court whilst simultaneously acting as a treating therapist. I can conceive of no basis for maintaining the intensely therapeutic relationship while providing objective opinions that might be adverse to the interests of the patient. One or the other must give way, and consistent with the Hippocratic oath, the way that gives must be the forensic one.

On the other hand, Dr. Martinez's testimony is singularly impressive and credible. Accordingly, I find and conclude that his retrospective assessment that over a twelve to fourteen year period Konya, Jr., has suffered from a mental illness that is fairly well regulated and that during the period of October, November 2000 he was in a compensated state with no cognitive, intellectual or perceptual distortions that prohibited him from entering into a binding contractual agreement. I further find that Konya, Jr.'s understanding and appreciation of his contract with First Data Corporation was not

affected by his chronic mental illness. I find he was mentally competent to contract and indeed that is precisely what he did.

Accordingly, declaratory judgment shall enter in favor of First Data Corporation and against the defendants on the merits of the question presented. Each party to pay his or its own costs.

Dated: May 27, 2008.                                             **s/John L. Kane**
                                                                 SENIOR U.S. DISTRICT JUDGE